^Opinion of the court, by
Judge Burnet :
The complainants insist, that the deed, executed to the defendant, by N. Gregg, for himself, and as executor of the last will and testament of his brother, R. Gregg, ought to be set aside on the following grounds : 1. That it was wholly without consideration. 2. That the contract between the. defendant and the Greggs, for the purchase of the land from the government at the public sales, was in direct contravention of the act of Congress, and therefore fraudulent and void, and that it was also a fraud at common law. B. That the executor was not authorized by the will to execute the deed, and that by doing so he has attempted to practice a fraud on the complainants. 4. That if the executor was authorized to convey, the answer and exhibits show such a case of imposition on the executor, that a court of equity will relieve against it.
1. It will be recollected that the consideration mentioned in the deed is one dollar. This is, prima facie, a good consideration, and, until it be impeached, is sufficient to sustain the deed. But the complainants have cast on it the imputation of fraud. They declare it to be fictitious, and allege that the conveyance was wholly without consideration. They have called on the defendant to answer that allegation, and to state what the real consideration was, if any existed. The answer sets out ah agreement, by which the defendant and N. and R. Gregg pur-chased a section and fraction of land, at the public sales; that the defendant advanced the first payment; that the certificate of the purchase was taken in the name of the Greggs; that some time after the Greggs purchased out his equitable right, and gave him a title bond for one hundred acres of the land, being the land now in controversy, *171 and that after the death of R. Gregg, N. Gregg, in good faith, executed the deed in question, agreeably to the condition of the title bond. The proof, as far as it goes, corroborates and confirms the answer. The certificate, signed by N. and R. Gregg, establishes the equitable interest of the defendant in a moiety of the whole tract. It declares that he was jointly concerned in the purchase, and that bis conduct in the whole of the transaction was correct and honorable. It also admits that the first ^payment was advanced by him. The deposition of William Creighton corroborates the answer, in relation to the title bond. The whole answer is responsive to the bill. It is not impeached by any part of the testimony, and as far as the want of consideration is involved, it satisfactorily rebuts the charge.
But it is alleged that the defendant has no right to avail himself of the facts disclosed by the answer, because they show a consideration different from that expressed in the deed. Why, then, it might be asked, was the defendant required to state them ; and why did not the complainants rely on the evidence within their power ? They seem to have taken it for granted, that the deed, prima facie, was good — that it was sufficient to convey the estate— and that they must fail in the object of their suit, unless they can impeach it. It was for that purpose that they called for the disclosure. If they avail themselves of it as evidence, it purges the transaction of fraud, as to the consideration. If they reject it, they stand as they were, and the deed remains unimpeaehed. It is believed, however, that this objection applies to deeds that have been actually impeached, and which can not be sustained without explanatory proof, and that in such cases it goes no further than to exclude evidence of a consideration, .inconsistent with the one expressed; but that a party may aver another consideration, provided it be consistent with the one expressed in the deed. This seems to be the rule in Phillips’ Ev. 424, 425, and in the cases there referred to.
If the objection should be applied to all cases in which there is charge of fraud unsupported, and extend so far as to prohibit-proof of any variance between the real consideration and that expressed, much inconvenience and injustice would result, because however fair and upright the transaction might be, an omission to state the exact consideration would prove fatal to the deed.
The proposition seems to amount to this, that a variance between *172 the true consideration, and that expressed, is a fraud per se, that can not be purged or explained by proving the truth. It sometimes happens, in an exchange of property on which no cash value has been fixed by the parties, *that a nominal sum is stated in the deeds bearing no comparison with the value of the property conveyed. This is innocently done for the purpose of convenience ; no person is, or can be injured by it, yet on the proposition advanced by counsel, the deeds are fraudulent; they may be avoided by the creditors or heirs of the grantors, and the grantees are without remedy.
The cases cited on this point do not sustain the complainants. The one in 7 Johns. 341, was a suit at law, brought on articles of agreement. The plaintiff offered parol proof of an agreement, not contained in the articles, in addition to the covenant expressed, which was not admitted. The court remarked, however, that if the deed were contrary to the truth, the party might have relief in equity.
The ease cited from 1 Johns. 139, is of the same character. It was an action brought on a parol promise, set up as additional consideration for the conveyance of personal property, which was not mentioned in the written contract.
In the case of Clarkson v. Hanway, 2 P. Wms. 203, the grantor was a weak old man, seventy years of age. The consideration expressed in the deed was an annuity of twenty pounds, which bore no comparison with the real value .of the premises. To repel the fraud, proof was offered that natural love and affection was a part of the consideration of the conveyance. The evidence was vague and contradictory, and was rejected as being incompatible with the consideration expressed.
Watt v. Grove, 2 Sch. & Let. 500, was a case of gross and complicated fraud. The deeds set up were impeached. The chancellor remarked, “That it would be dangerous to permit an impeached deed to be supported by evidence of considerations wholly different from those alleged in it.” “That the court might reform, the deed when the incorrectness does not go to impeach the general fairness of the transaction.” This is all the defendant asks. Having shown that the transaction was perfectly fair, that the incorrectness was of a nature not calculated to injure or deceive, and that the real consideration was altogether consistent with the one *173 expressed, he insists that his deed is reformed, and ought to be sustained.
2. *The second ground taken in support of the bill is, that the original purchase of the land in question, at the public sales, was in contravention of the act of Congress, and contrary to the principles of the common law.
To decide on the first branch of this objection, it is necessary to examine the acts of Congress on this subject.
Section 4 of the act of 1796 directs that the land shall be offered for sale at public vendue, under the authority of the governor, or the secretary of the Western territory, and the surveyor-general.
By section 8, the governor of the territory northwest of the river Ohio is directed to cause books to be kept, in which shall be regularly entered an account of the dates of all the sales made; the situation and number oí the lots sold; the price at which each was struck off; the money deposited at the time of sale; and the dhtes of the certificates granted to the different purchasers. It is made the duty of the governor, or secretary of the said territory, at every suspension or adjournment, for more than three days of the sales under their direction, to transmit to the secretary of the treasury a copy of said books certified, etc.
Section 4 of the act of May, 1800, substitutes the register of the land office in place of the surveyor-general, and directs the lands to be offered at public vendue, under the direction of the register of the land office, and of either the governor or secretary of the Northwestern territory. It also provides that the superintendents shall observe the rules and regulations of the preceding act in classing and selling fractional with entire sections, and in keeping and transmitting accounts of the sales, and that all lands remaining unsold at the closing of the public sales may be disposed of at private sale by the registers of the respective land offices, in the manner thereinafter prescribed.
By section 7 it is made the duty of the register to receive and enter on books, kept for that purpose only, the applications of any person or persons who may apply for the purchase of any section or half section, and who shall pay, etc.
By section 9 it is made the duty of the registers of the land offices to transmit quarterly, to the secretary of the treasury and to the surveyor-general, an account of the several tracts applied for.
^Section 10 provides “that the registers aforesaid shall be *174 precluded from entering on their boohs any applications for lands in their own name, and in the name of any other person in trust for them; and if any register shall wish to purchase any tract of land, he may do it by application to the surveyor-general, who shall enter the same on books to be kept for that purpose by him, who shall proceed in respect to such applications, and to any payments made for the same, in the same manner which the registers, by this act, are directed to follow in respect to applications made to them for lands by other persons.” These are all the provisions that appear to have any bearing on the question; and from a careful examination of them the following conclusions seem to result:
1. That at the time the land in question was sold the register and the governor, or secretary of the territory, were constituted superintendents of the public sales.
2. That it was the exclusive duty of the governor, as one of the superintendents, to cause books to be kept, in which should be entered an account of the proceedings at those sales.
3. That it was made the express duty of the governor or secretary of the territory to transmit copies of those books to the secretary of the treasury, and that the public sales were considered as being under the particular direction of the governor or secretary, as either might attend.
4. That the surveyor-general, under the act of 1796, was not required to take any agency in keeping the sale books, or transmitting copies, and that as the register was substituted for the surveyor-general by the act of 1800, which expressly requires the superintendents to observe the same rules and regulations in keeping and transmitting accounts of the sales as were prescribed in the act of 1796, as follows: That the register was not required to take any agency in keeping those books or transmitting copies.
5. That private sales are to be effected by application to the register, who must enter the same in a book kept for that purpose only, which must therefore be distinct from the book of public sales kept by the governor, and may be denominated the register’s sale book.
6. That the only prohibition as to the registers is that *they shall not enter on their books any application for lands in their own name, or in the name of any other person for their use.
If these inferences be correct, it must follow that the registers *175 a^e not prohibited from purchasing at the public sales, because public sales can not be made on application, and are not entered on the register’s book, but on the sale book kept by the governor or secretary, and because the prohibition being confined to such sales are made on a pplications that must be entered on the register’s book, it can not embrace public sales that are not so entered.
It also follows from these premises that the public sales are so guarded by the agency of the governor, as to render the prohibition altogether unnecessary.
The government are as well protected from imposition at the public sales, by a faithful discharge of the duties assigned to the governor, as they are at private sales, by the vigilance of the register. It would be unreasonable to extend the prohibition beyond the letter of the statute, when no beneficial object would be gained by it, either in relation to the rights of .the government or of third persons. The construction set up by the complainants would effectually prevent the register from purchasing any part of the land disposed of at public sale,. because the provisions made in their favor by section 10 can not be resorted to till the public sales, at which every tract must be offered, have closed, and the private sales have commenced.
If it had been the intention of Congress to prevent them from purchasing at the public sales, in the ordinary way, it is a reasonable supposition that some other way would have been provided through the agency of the governor or surveyor-general, as has been done in relation to purchasers by application and entry. The privilege given to the registers, of purchasing by application and entry, was intended as a substitute for the right which is taken away in the preceding part of the section; we should therefore naturally conclude that it was as broad as the prohibition. But such can not be its operation, if the prohibition be extended to purchasers at public sales, for the very obvious reason that the public sales must have closed before the register can have availed himself of the substitute.
*It is not necessary here to resort to the technical meaning of terms, or the distinction of characters, in which the defendants acted, first as superintendent of the public sales, and afterward as register of the land office; for, if the terms used in section 10 had been sufficiently comprehensive to embrace both public *176 and private sales, we should not have construed their meaning or restricted their operations on that ground.
But if the register had been guilty of a manifest fraud on the government, it is a question between the parties affected by the transaction. Government might have disavowed the contract and withheld the title, or they might have waived the objection and confirmed the sale. This they have done, and it does not lie in the mouth of a third person to complain. The party on whom a fraud is practiced may take advantage of it, or waive it. If he does the latter, and confirms the contract by executing a deed, third persons can not impeach it, much less can a particeps criminis be suffered to do so. If any fraud was practiced in this case, it was by the Greggs, who purchased the property in their names, for the joint benefit of themselves and the register. They were the persons who consummated the fraud, and to say the least of them, they were in pari delicto with the register. The objection, therefore, extends further than counsel would willingly follow it. If the statute contains such a prohibition as renders a purchase, made in the name of another, for the benefit of the register, a fraud on the government, such a purchase is not only void as to the register, but as to all others concerned with him. The act can not be purged by excluding the register. If fraud existed, the Greggs participated in it, and must be equally affected by it. The objection goes to the whole purchase, and taints it throughout. The same principle that would justify the court in deciding against the defendants, would restrain them from' decreeing in favor of the complainants. In all such cases equity refuses to interfere in behalf of either, and as the complainants claim in the character of devisees of R. Gregg, they stand in his shoes.
In regard to the second branch of this objection, it may be remarked that it is not necessary to resort to the common *law to determine the legality of this purchase. The powers and disabilities, the privileges and prohibitions of the register are regulated by the statute, and are to be decided by it. Congress having prohibited him from purchasing at private sales, by application in his own office, without including in the prohibition the right of purchasing at the public sales, the natural inference is that they intended to permit the latter. By including in the prohibition only one of the modes of purchase, they have' virtually excluded from it the *177 other, thereby clearly indicating it to be their intention not to prevent him from purchasing at the public sales.
But waiving this inference from the statute, the authorities cited to show that the consideration is bad, and the sale void at common law, are not applicable to the case as between these parties.
The general doctrine in Sug. Law Vend., chap. 14, sec. 2, is that trustees, agents, etc., are not permitted to purchase the property to which their trust extends, except under certain restrictions; but as such purchases are merely mala prohibita, not mala in se, they admit of confirmation by the injured party, who alone can take advantage of them; and if the cestui que trust acquiesces for a long time, equity will not assist him to set aside the sale.
In this case, the cestui que trust has not only acquiesced more than twenty-five years, but has literally confirmed the sale. He is still satisfied with it, and the only complaint we hear is from third persons, who occupy the place of a particeps criminis. The doctrine is well established that the remedy for a breach of trust is exclusively with the party injured. The cestui que trust may apply for a new sale, or may confirm the former sale; and if the purchaser (the trustee) has sold at an advance, he may claim the excess.
In Davoue v. Tanning, 2 Johns. Ch. 252, the principle is clearly expressed that none but the party injured can question the validity of the sale. In that case, Chancellor Kent ordered the lot to be set up again and resold for the benefit of the cestui que trust, provided it would sell for more than the amount of the former sale, together with the sum expended in improvements and interest; but if it would not sell for more than that amount, that the first sale should be confirmed. .
*In Doolin v. Ward, cited from 6 Johns. 194, the claim of the plaintiff rested on a verbal promise that if the plaintiff would not bid against him at a public sale, he (the defendant) would purchase the articles, and divide them with the plaintiff. No consideration passed, nor was there anything obligatory on either party.
But if, as in the case before us, the plaintiff had paid the first installment of the purchase money, and the defendant having availed himself of that payment, had afterward given his obligation to the plaintiffs to deliver him a part of the articles, there would have been some resemblance between the eases, and the decision would probably have been very different.
*178 3. The third ground is that the executor was not authorized to make the conveyance, and that in doing it he has attempted a fraud on complainant. From the phraseology of the objection, it might be considered as confined to the simple act of the execution and delivery of the deed; but as it is generally true that the greater power involves the less, the objection was, no doubt, intended to extend as well to the power of negotiating the contract, as to the right of consummating it by passing the title.
This branch of the case necessarily leads to the examination of the will of R. Gregg. After appointing his brother, N, Gregg, sole executor, the testator goes on to say, “I do invest him with full, ample, and complete power to dispose (after my decease), in such •manner as he thinks proper, all my estate of every description, real and personal, and invest him with full power to settle' ápd adjust all my worldly affairs, as he pleases; meaning expressly tó invest him with as full power to that effect as I might possess, not incompatible with the tenor and substance of this last will and testament.” It appears to me that language could not easily be selected better calculated to express the power claimed by the executor than that which the testator has adopted. The epithets .are strong and comprehensive; the power to dispose, and the manner of doing it, are limited only by the discretion of the executor, and it is extended to the whole estate, real and personal. He is also to settle and adjust all his worldly affairs as he pleases, and to prevent *cavil, and as if to make certainty more certain, ho declares it to be his express intention to vest in his executor the same power that he himself then possessed.
The unavoidable conclusion is, that the executor has power to sell the estate, and to settle and adjust all claims against it.
The executor being clothed with this power, the defendant presented the title bond, executed by the testator and himself. Being fully satisfied with the justice of the demand, he was bound in the faithful discharge of the trust to settle it by conveying the land, and taking up the bond.
4. The last ground taken by the complainants is, that if the executor was authorized to sell and convey, yet the answer and exhibits show it to be such a case of imposition that equity ought to relieve. The complainants undertake to maintain this ground by taking it for granted that the claim was against law, and without-consideration. The first part of this hypothesis has been dis* *179 posed, of already, and it is only necessary to look into the answer and exhibits to ascertain that no part of it is supported by the facts. The defendant, as appears from the certificate of the Greggs, as well as from the answer, had an equitable right to the undivided moiety of a section and fraction of land in the vicinity of Chillicothe, purchased in the name of the Greggs at the public sales. It was ascertained that there was a large surplus in the tract — the defendant had advanced the first payment — the claim had been held in common upward of a year — the country was increasing at that time in population with unexampled rapidity, and although the land in the first instance might have been purchased at a fair price, it must have risen greatly in value during the period that the parties held it as a joint property.
This being the state of the case, an agreement was made between the parties by which the defendant was to relinquish his claim to the entire tract. The Greggs were to refund the money advanced by defendant, and convey to him, when the patent should be procured, one hundred acres on the side of the tract adjoining his other lands. The money was refunded, and a title bond given for the one hundred acres. From these facts it would seem that *the consideration was abundantly sufficient to support the contract, and that the advantage to the parties must have been about equal; but whether this was so or not, they were all men of prudence, equally acquainted with the situation and nature of the property, and of their respective rights in it. There was no misrepresentation or concealment of the truth, N. and R. Gregg must have supposed they were making a good bargain; there is no evidence to show they were not, and they seem to have been contented. With the exception of Mrs. McClean’s deposition, which, to say the least of it, is accompanied with very suspicious circumstances, there is no evidence that they at any time complained of their bargain, or wished to rescind it. But if that deposition be taken as true, the presumption is that the objection of R. Gregg, of which she speaks, was an after thought, originating, not from a belief that he had made a bad bargain, but from a hope that he might oust the defendant of all right, on the supposition that he could not become a purchaser at the public sales. On no other ground can the objection be reconciled with the certificate he previously gave in conjunction with his brother. But be this as it may, the contract appears to be fair, equal, and equitable. *180 The suspicions cast on it by the bill are very naturally explained, and fully obviated by the answer, which is responsive, and is not contradicted but corroborated by the testimony. It is not the province of equity to weigh the mutual considerations leading to a contract with great exactness, in order, to ascertain if there be not some grains of difference, nor does it ordinarily limit the power, or control the discretion of the contracting parties, who are treated as free agents and left to the exercise of their own judgments. Whenever equity does interfere with a contract, or refuse its aid to carry it into execution for inadequacy of consideration, it is on the ground of fraud, which must either be clearly proved, or result irresistibly at the first view, and without calculation from the grossness of the disparity. -
The complainants do not present such a case. The most natural inference to be drawn from every thing disclosed, is that the disparity, if there be any, was in favor of the * Greggs. It was contended by the complainants’ counsel, that the defendant, by his certificate to N. and R. Gregg, that they were the purchasers of the land, was estopped from setting up a claim to any part of it. I do not see how such a consequence can result from that certificate as it contains nothing inconsistent with the existence of a trust. It frequently happens, for convenience, that one joint purchaser takes the title in his own name, at the request or on the express order of the other purchasers. Sometimes land is conveyed to an agent by an absolute deed, as the most convenient way of effecting a sale, but such a deed would not estop the owner from showing the trust and claiming the purchase money. The certificate in this case was prima facie evidence that the right was exclusively vested in the Greggs, but that inference was not inconsistent with the existence of a trust. A grantor is sometimes estopped by his own deed, but it must be in relation to a matter wholly incompatible with it; as, if a person holding an equitable title should sell and convey by deed in fee, with covenants of seizin and warranty, and should afterward obtain a legal title in his own name, his deed would inure to the benefit of his grantee, and he would be estopped by his covenants from setting up title in himself which would falsify those covenants and be wholly incompatible with them; for, if the covenants be true, the legal title passed by the deed. In this case the certificate of the defendant was compatible with an agreement, that when the patent should *181 be obtained in the name of the Greggs they should convey a moiety or any other portion of the land to the defendant.
But, independent of all other considerations, if the facts set up by the complainants be true, and the legal inferences they draw from them be correct, they have a complete remedy at law. An examination of the case, as they present it, will show that on the death of their ancestor the legal title vested in them; that the defendant never had an equitable right to any part of the land; that the executor had no right to convey, and that the deed to the defendant was fraudulent and void. On that state of the case, which is the ground on which they have placed themselves, they have no necessity for the aid of chancery.
'*Again, as it has been decided that the acts of Congress do not prohibit the register from purchasing at the public sales, it follows that he had an equitable right to an undivided moiety of the whole tract, and that if the contract on which the title-bond was given be not valid that right has not been extinguished. And, as it is- a rule that he who asks equity must do equity, it would seem that if the complainants could get rid of that contract they would thereby establish the defendant’s right to the undivided moiety; consequently a decree for a reconveyance of the one hundred acres would be on the condition that they conveyed to the defendant his undivided interest in the entire tract on equitable terms.
The bill must be dismissed at the cost of the complainants.

Note bt the Editor. — When a consideration of a kind different from that expressed in a deed maybe proved, see Wright, 755; v. 121; xvi. 438, and cases cited in the last case.
Eor late decisions touching relief in equity, in cases of mistake of law and fact, see xi. 223; xv. 152; xvi. 490; xviii. 116. Equity will not correct a mistake in the deed of a married woman, xvii. 105, and cases cited. But see 47 Ohio L. 53.