## ALLEGED FRAUDULENT CONVEYANCE OF PROPERTY BY A GUARANTOR.

Circuit Court of Lucas County.

LOUIS M. COLE, AS ADMINISTRATOR OF THE ESTATE OF LUCY A. COLE, DECEASED, v. THE MERCHANTS NATIONAL BANK OF TOLEDO, OHIO; AND THE MERCHANTS NATIONAL BANK OF TOLEDO, OHIO, v. JOHN T. NEWTON ET AL. *

Decided, November 9, 1907.

*Guaranty of Loans—Form of, Permitting Extensions—Evidence Tending to Show what Loans Were Contemplated Competent When Specially Pleaded—Extent to Which Dismissal of Proceedings in Involuntary Bankruptcy—Bars Attack in a State Court on an Alleged Fraudulent Conveyance—Knowledge of Grantee and Grantor as to Insolvency of Grantor—Consideration of One Dollar Does Not Create a Presumption of Voluntary Conveyance, When—Deed in Form of Mortgage Recorded as a Deed—Circumstances Under Which a Valid Preference Mortgage May Be Made.*

1. Under the terms of a guaranty reading, "I hereby guarantee the payment of all notes of F. E. & G. H. Cole, held by the Merchants National Bank, also all renewals of same, and any new loans made to either F. E. or G. H. Cole by the said bank," extensions of such loans are authorized; and the fact that the extensions were made of loans so obtained does not release the guarantor.

2. In an action upon notes claimed to be covered by such a guaranty, it is competent, where the circumstances surrounding the parties at the time of the execution of the guaranty are specially pleaded, to introduce evidence thereof tending to show what loans were contemplated by the parties thereto; and it is prejudicial error, in such a case, to strike out allegations as to circumstances which might reveal the intention of the parties, or to refuse to admit evidence relating thereto.

3. Where a conveyance of property was made the basis of a proceeding to declare the grantor bankrupt, on the theory that the transfer was in fraud of creditors, and the result was a dismissal of the proceedings upon a finding that the grantor was not a bankrupt, the

---

* Affirmed by the Supreme Court without opinion, 82 Ohio State, 444.

grantee not being a party to the proceeding and therefore not bound thereby, can not avail himself of the plea of *res adjudicata* and in so doing attempt to bind others, in a subsequent action in a state court to set the conveyance aside as preferential.

4. But the heirs and personal representative of the grantor may stand upon the judgment in the bankruptcy proceeding to the full extent to which it would be available to the grantor, if living; and an equity remaining in the land after satisfying the indebtedness existing from the grantor to the grantee at the time of the transfer, it is the privilege of the heirs and personal representative to assert the plea of *res adjudicata* as a defense to an action in the state court to set the conveyance aside as in fraud of creditors; and inasmuch as the judgment in the bankruptcy court was in effect a finding that in making the transfer there was no intent on the part of the grantor to hinder, delay or defraud her creditors, that determination as between the parties and their privies is conclusive in all courts as long as it stands, and is therefore good against demurrer in an action in the state court to set the conveyance aside, based on the contingent liability of the grantor under the guaranty above recited, but of which liability the grantor could not be held to have had knowledge at the time of the transfer in the absence of actual knowledge of the default of her principals.

5. The facts and circumstances surrounding the parties to this case at the time of the making of the transfer, as presented by the evidence, do not show such knowledge on the part of the grantee of the financial condition of the grantor as would render the transfer invalid.

6. Where a consideration of one dollar is stated in a deed passing property from debtor to creditor dealing in good faith and innocently with respect thereto, and it afterward developed that the grantor had other creditors, a conclusive presumption does not arise that the parties intended by the recital as to the amount of the consideration that the conveyance should be fixed as voluntary, even though in fact not voluntary, and thereby permit such other creditors to seize the property.

7. Where a deed, as between the parties at the time the transfer was made, was in effect a mortgage, but was not recorded within three days as required by the statute relating to the recording of mortgages, the fact that it was in form a deed and took effect as a deed made it proper that it should be recorded as a deed.

8. A valid preferential mortgage or deed may be made in Ohio by an insolvent, provided the grantee or mortgagee is not made a trustee for other creditors, and the grantee or mortgagee is in ignorance of a purpose to prefer, and the consideration is not so grossly in-

adequate in case of a deed as to justify a court of equity in regarding the conveyance as in a measure voluntary; or even with knowledge on the part of the mortgagee of the insolvency of the mortgagor, the mortgage may still be valid to secure loans made on the faith of a promise given at a time when the mortgagor was solvent that they should be so secured.

*Swayne, Hayes, Tyler & Fuller* and *Brown, Geddes, Schmettau & Williams,* for plaintiff in error.
*Kinney & Newton* and *Smith & Beckwith,* contra.

PARKER, J. (orally); HAYNES, J., and WILDMAN, J., concur.

The cases of Louis M. Cole as administrator of the estate of Lucy A. Cole, deceased, v. The Merchants National Bank of Toledo, Ohio, in this court on error, and the Merchants National Bank of Toledo, Ohio, v. John T. Newton, and others, in this court by way of appeal, affecting some of the same parties and involving in part the same subject-matter, were argued together. They are important cases, involving what seem to us to be close and difficult questions of law. We allowed counsel considerable time to present their views to the court and we have carefully read and considered the full and able briefs, but have not the time to formulate the decisions as we would wish so as to abbreviate and at the same time touch upon all the imporant questions involved.

We will first take up the case which is here on error. The action was brought against Louis M. Cole, as administrator, upon an instrument of guaranty, signed by Lucy A. Cole, reading as follows:

"March 29, 1898.
"I hereby guarantee the payment of all notes of F. E. & G. H. Cole, held by the Merchants National Bank, also all renewals of the same, and any new loans made to either F. E. or C. H. Cole by the said bank.
                                        "LUCY A. COLE."

The petition sets forth that, relying upon this guaranty, the bank "from time to time loaned to said F. E. and G. H. Cole large sums of money upon their promissory notes," and that there was at the inception of the suit, due to the bank thereon

$44,834.32; and that the claim had been presented to the administrator and disallowed, and there is a prayer for personal judgment.

To this petition the administrator filed an answer, admitting the execution of the guaranty, the loaning of the money to F. E. and G. H. Cole, the presentation and disallowance of the claim, and denying each and every other allegation in the petition; also setting forth that the guaranty was given by Lucy A. Cole "for and on account of loans already made, and thereafter to be made by said bank to said F. E. and G. H. Cole for and on account of work being then done and performed by them in the city of Toledo, Ohio, under contracts with the said city of Toledo, and for no other purposes whatsoever; that at the time said paper was executed the said F. E. and G. H. Cole were engaged in the work of paving streets and building sewers in the city of Toledo, under contracts with the said city, and had been so engaged for a long time prior thereto, and were, and had been doing business with said bank, and had borrowed money from said bank to be used in the prosecution of said work, and were at said date indebted to said bank in the sum of $13,200, as evidenced by their promissory notes, for money so borrowed, and on said day applied to said bank for a further loan, the proceeds to be used in the prosecution of said work, and thereupon the said bank demanded of them that their mother, the said Lucy A. Cole, should guaranty the payment of said loans, and thereupon said paper was prepared by one of the officers of said bank, and taken to said Lucy A. Cole by one of her sons, and signed by her, and it was not intended or contemplated, either by said bank or said Lucy A. Cole, that such guaranty should apply to any loans made by said bank to said F. E. and G. H. Cole, or either of them, other than loans made for and on account of work done under said contracts with the said city of Toledo; that said bank had full knowledge of the character of the work in which the said F. E. and G. H. Cole were engaged, and full knowledge of the place or places where said work was being carried on, and of the purposes for which said money was borrowed and used." That "the indebtedness from F. E. and G. H. Cole to the bank existing on March 29,

1898, and all loans made by said bank to said F. E. and G. H. Cole, or either of them, after said date, for and on account of said contracts, or any work performed under said contracts, have long since been paid in full." And, to abbreviate somewhat, this answer further sets forth that about the first of January, 1901, the sons had completed all the work they had contracted to do in Toledo; that they made no other contracts for Toledo after that and received no loans on Toledo contracts thereafter. That in the summer of 1901 they entered into a contract for the construction of a tunnel, or section thereof, in Philadelphia, Pennsylvania, and in September, 1902, they entered into a contract for tunnel work at Dossett, Tennessee, and that money was loaned to them by the bank on those contracts. Those loans were evidenced by promissory notes, and whatever claims the bank may have, are based upon those loans and not in any respect upon the loans for the Toledo work. That the bank had full knowledge of these outside contracts and of the nature of the work and that the loans were made with full knowledge that they were to be used in the prosecution of such work and that these loans were made without any consultation with or any notice to Lucy A. Cole. There is a further averment to the effect that these loans were extended, the claim being that, even if Lucy A. Cole had been bound by these loans, she was released as guarantor because of the extensions.

I may as well say now, respecting this claim, that we are of the opinion that, under the terms of this guaranty, even in view of the circumstances related in this answer, such extensions were authorized and therefore would not release Lucy A. Cole as guarantor.

The answer further sets forth that no demand of payment of any part of this indebtedness was made on Lucy A. Cole, nor was any notice ever given her as to the amount or condition of such indebtedness, nor did she ever have any knowledge of any extensions of time of payment. These allegations have relation chiefly to the point that I have just decided. It is apparent that the purpose of these allegations to which I have called attention, and which I have, for the most part, read, were to

bring to the attention of the court certain circumstances surrounding the execution of this guaranty, and that the effect or result desired was that the very general terms used in this instrument of guaranty, to-wit, "all notes," "all renewals" and "any new loans"—especially the latter—might receive at the hands of the court a construction in some measure limiting the very general scope, or the ordinary and usual meaning of these words.

A motion was made on behalf of the plaintiff to strike all this matter from the answer. This motion was sustained; the court being of the opinion that evidence as to these surrounding circumstances would not be admissible, and that, therefore, the averments were idle. Exceptions were taken to this ruling. A jury was waived, and on the presentation of the case to the court upon the pleadings as they stood after this matter was stricken out, the defendant offered testimony tending to sustain each and every of the allegations of the answer which had been stricken out, and this tender of testimony was rejected, the defendant was not allowed to prove these things, and this question was saved. A finding and judgment for the plaintiff for the full amount claimed necessarily followed.

Did the court err in striking out the allegations of the circumstances surrounding the transaction and in refusing to receive proof of the same? If such circumstances may be shown to raise an ambiguity and to bring about a construction modifying, restricting or enlarging the ordinary or usual meaning of the terms used in a written contract, then we think that such facts, relied upon as having this effect, should be pleaded—the ultimate facts as distinguished from the evidence which would be adduced in support of the allegation that it was not intended that the words used should apply to certain matters. It is sometimes very difficult to draw the line between what are facts to be pleaded and what is evidence to be adduced in support of the facts, but we are of the opinion that such facts as are relied upon might not be introduced in evidence under the denials found in this answer; that it would be necessary to plead the matter substantially as pleaded here; and therefore, if these are competent facts that might be established by the evidence, manifestly it

was prejudicial to strike it out.  So that we come at once to the chief point of controversy—as to the admissibility of evidence of such matter.

I may add on the subject of pleading, that we find that where such matters have been admitted, as a rule at least, they appear to have been pleaded; it does not seem to have been supposed that the matter could be introduced in evidence without being specially pleaded.  An illustration of this I find in the case of *The Cambria Iron Co.* v. *Keynes et al,* 56 O. S. Reports, at page 501. The third defense as there set up appears at page 510.

Now it is contended by the plaintiff that the guarantee as written is unambiguous and that circumstances surrounding the transaction may not be shown to raise a latent ambiguity, and then be so considered and applied as to explain such ambiguity, and, in effect, substantially modify the plain provisions of the writing.  That such words as ''any new loans'' used in this case may not be thus modified.  That if the instrument is to be modified in this way it must be done by a suit in equity for its reformation on clear proof of fraud, accident or mistake.

On the other hand, it is contended that the circumstances under which the words were used may be shown to make manifest the true sense in which they were used by the parties to the contract, to show the purpose and intent of the parties, even though this may restrict or enlarge what might be termed the ordinary meaning of the words; and that this is especially admissible to apply the contract to the subject-matter, and that here the subject-matter was certain contemplated loans, and that the facts sought to be shown would disclose clearly what loans were contemplated by the parties.

The plaintiff cites many cases in support of his contention, but some of these cases are based upon and are illustrations of the general rule that parol evidence of negotiations, expressions of intention, etc., is not admissible to add to or subtract from a contract, or to vary the plain, unambiguous terms thereof, where the contract appears upon its face to be complete.  Some of these cases to which I am now referring do not go to the question of the admissibility of proof of surrounding contemporaneous

circumstances shedding light upon the intents and purposes of the parties as an aid to construction of terms that may admit of some restricted or enlarged meaning somewhat at variance with what may be said to be their ordinary meaning.

However, many of the cases cited on behalf of the plaintiff seem fully to sustain the position that the language used must be ambiguous or of doubtful meaning, before the court may resort to and take into consideration the facts and circumstances surrounding the parties at the time the contract was entered into, as an aid to construction. But the authorities on this point are not in harmony or reconcilable. Our examination of the cases cited by counsel for both parties has convinced us that, outside of Ohio, the weight of authority favors and supports the proposition that such circumstances may be resorted to as aids to construction so long as the use to be made thereof is to apply the contract to the subject-matter, and as long as the construction does not do violence to the language used, even though on their face the words to be construed may have an ordinary meaning that may be said to be unambiguous. We think that such words as "all" and "any," general comprehensive terms, are words of this character; that it may be shown that such words were not used in their most comprehensive and universal scope and meaning. The circumstances may easily render such words ambiguous, and may even go further and show that to accomplish the intent of the parties, the words "all" or "any," when applied to the subject-matter, must be restricted so as not to cover as much as they would ordinarily amount in effect to recitals thereof contained in the instrument. They may be shown to have so entered into the thought of the parties that it would be proper to consider them as if stated in the instrument under a "whereas" and considered as a part of the context of the operative words of the instrument; and manifestly, if all these facts which are alleged in this answer were recited in the instrument under a "whereas," the court would look to such recitals in order to place a construction upon the operative words following, amounting to a guaranty of "all notes,"  *  *  *  "all renewals," or "any new loan."

In the case of *Reed* v. *Insurance Co.*, 95 U. S., 23, I read, from pages 30 and 31, this language of Mr. Justice Bradley, who was speaking for the court in deciding the case—but, before reading that, I will read the second paragraph of the syllabus:

"Although a written agreement can not be varied by proof of the circumstances out of which it grew, and which surrounded its adoption, they may be resorted to for the purpose of ascertaining its subject-matter, and the stand-point of the parties in relation thereto."

Now I read from the opinion, on page 30:

"This case, upon the merits, depends solely upon the construction to be given to the clause in the policy before referred to, namely 'the risk to be suspended while vessel is at Baker's Island loading;' and turns upon the point whether the clause means, while the vessel is at Baker's Island *for the purpose of loading,* or while it is at said island *actually loading.* If it means the former, the company is not liable; if the latter, it is liable."

It will be seen that what was desired was, in fact, to put a construction upon the word "loading," which would seem to require the insertion of the words, "for the purpose of," in order that the word "loading" might be understood as intended by the parties. Justice Bradley continues:

"A strictly literal construction would favor the latter meaning. But a rigid adherence to the letter often leads to erroneous results, and misinterprets the meaning of the parties. That such was not the sense in which the parties in this case used the words in question is manifest, we think, from all the circumstances of the case. Although a written agreement can not be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the stand-point of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensible as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they

appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities.    On this subject Professor Greenleaf says:    'The writing, it is true, may be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties; but, as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it, or substituted in its stead.    The duty of the courts in such cases is to ascertain, not what the parties may have secretly intended, as contradistinguished from what their words express, but what is the meaning of the words they have used'' (1 *Greenleaf Ev.*, Section 277).    Mr. Taylor uses language of similar import.    He says:    'Whatever be the nature of the document under review, the object is to discover the intention of the writer as evidenced by the words he has used; and, in order to do this the judge must put himself in the writer's place, and then see how the terms of the instrument affect the property or subject-matter. With this view, extrinsic evidence must be admissible of all the circumstances, surrounding the author of the instrument.'    *Tayyor, Ev.*, Section 1082.''

Again he says:

''It may, and indeed it often does, happen, that in consequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different from what it would have received, had it been considered in the abstract.    But this is only just and proper; since the effect of the evidence is not to vary the language employed, but merely to explain the sense in which the writer understood it.''    Citing Section 1085, and *Thorington* v. *Smith,* 8 Wal., 1, and remarks of Mr. Justice Strong in *Maryland* v. *Railroad Company,* 22 Wal., 105.

Another case that we have examined is very instructive on this point and affords a very good illustration of the use that may be made of the circumstances, and, very often, of the necessity of the court having the circumstances before it in order that the contract may be comprehended.    I refer to the case of *Stoops* v. *Smith,* 100 Mass., 63.

But, we do not feel called upon to weigh and so pass upon the weight of the authorities which seem to be opposed upon this

question outside of Ohio; we believe the question is substantially settled for us by the Supreme Court of this state. The case of *Birdsall* v. *Heacock*, 32 Ohio St., 177, was upon a written guaranty as follows:

                                     "Alliance, May 11, 1868.
"E. H. Potter: Please send my son the lumber he asks for and it will be all right. I had to get him to write this as I was kicked with a horse one week ago on the arm and can not more than write my name if that.
                                     "Signed, EDWIN HEACOCK."

In the syllabus it is said:

"A letter addressed to a lumber merchant in the following language, 'Please send my son the lumber he asks for, and it will be all right,' is a guaranty that the lumber sold and delivered to the son at the time of its presentation, will be paid for.

"But such guaranty is not *continuing*, so as to make the guarantor liable for lumber subsequently purchased by the son from the same merchant. And payments afterward made by the principal, on account, will be applied in satisfaction of the first purchase, and consequent discharge of the guarantor's liability."

In arriving at this conclusion as to the construction to be put upon the guaranty, the court took into consideration the circumstances surrounding the transaction. Here the circumstances were set forth in order that the apparent meaning of the guaranty might be extended somewhat, but the court nevertheless deemed it proper to consider such circumstances. I read from page 182:

"In order, therefore, to extend the meaning of this guaranty beyond the necessary import of its terms, the petition under consideration states that it was written and acted upon under certain circumstances which are supposed to give its language a meaning that it would not otherwise import. But, looking to all the circumstances stated in the petition, we think they are not sufficient to give the guaranty relied on a more extended meaning than its terms would ordinarily import. It is averred that the guarantor knew that his son was about engaging in the lumber business, which he expected to carry on for several seasons. But

the writing contains no reference to that fact; and it is not averred that the son expected or intended to make a series of purchases of lumber from the plaintiff, and that this fact was known to the father. It is also alleged that the plaintiff from time to time, .furnished to the son the different bills of lumber stated in their account in reliance upon this guaranty. But it not alleged that this fact was, during this time, known to the father, or acquiesced in by him. Had such been the fact, it would be a practical construction of his contract, by the guarantor, which we might well adopt and enforce."

Now it is true that the rule as applied by the Supreme Court in this particular case, would go no further than to admit extraneous circumstances where there is some ambiguity upon the face of the writing. I read from page 182:

"In all written contracts, we think the language of the parties should be so construed as to give effect to their clearly understood intention.

"And as an additional rule, we think it well settled that all contracts, in which the terms are in any respect equivocal, should be read in the light of the circumstances under which they were entered into. This is to be done, not for the purpose of varying the intention of the parties, as disclosed by the writing, but of ascertaining what the parties in fact meant by the doubtful language employed for the expression of their intention. The language of the guaranty in this case is, 'Please send my son the lumber he asks for, and it will be all right.'"

But we think it will be seen from a consideration of other cases, that the rule goes beyond this and admits the circumstances where *considered with the language,* they give rise to an ambiguity; or, otherwise stated, where, read in the light of the circumstances, the language may seem to be equivocal or ambiguous; and in such cases of latent ambiguity, and in all cases, the circumstances surrounding the transaction may be shown and considered as an aid to construction and especially to apply the contract to its subject-matter. I shall call attention to some cases decided by the Supreme Court of this state wherein it has been distinctly stated that surrounding circumstances are to be so used in case of latent ambiguity in the contract.

The case of *Morgan* v. *Boyer*, 39 O. S., 324, was also upon a guaranty, and the third clause of the syllabus is:

"The language used is to be understood in its plain and ordinary sense, as read in the light of the surrounding circumstances, the situation of the parties, and the object of the guaranty, and that construction given which most nearly conforms to the intention of the parties."

It will be observed that the guaranty in this case was very general in its terms, and the language in its comprehensive sense would seem to include anything that might be sold at any time by the seller, to whom the guaranty was given, to the person on whose behalf the guaranty was given.   It reads:

"Tiffin, April 11, 1876.

"Messrs. Morgan, Root & Co.:

"Gents:   The bearer, Mr. H. A. Bowlus, is visiting your city buying a few goods in your line, and anything you may be able to sell him will be paid promptly as agreed on, which I herewith guarantee.

"Yours respectfully, H. A. BOYER."

It was held that this was not a continuing guaranty; that it would apply to such goods only as might be purchased upon the particular visit referred to, the instrument being construed as referring to a certain visit.   The words "is visiting," the court regarded as equivalent to the word "visits," so that it might be understood as plural or singular—to mean visits from time to time or a visit at that particular time.   The court regarded these words, standing alone, as somewhat ambiguous; but after considering the words, and (as stated in the opinion):

"Applying to the construction of this guaranty the rules which we have stated, with the aid of the surrounding circumstances, and the purpose for which it was given, we are led to the conclusion that the plaintiffs were not justified in treating it as a continuing guaranty."

There is another case in the same volume, *Dayton* v. *Hoogland*, page 671.   This was an action upon a contract made by corres-

pondence, and Judge Oakey in delivering the opinion for the court, says, at page 680:

"The agreement in this case was made solely by correspondence between Mitander and Dayton, and is, therefore, an agreement in writing. Its construction is for the court. Parol evidence is not admissible to vary its terms (*Thurston* v. *Ludwig*, 6 Ohio St., 1; *Jones* v. *Brown*, 11 Ohio St., 601, 606; *Neil* v. *Trustees*, 31 Ohio St., 15, 19); nevertheless, the court may look not only to the language employed in the letters, but to the subject-matter of the agreement and the surrounding circumstances, so as to be able to see the transaction as the parties themselves saw it. *Merrian* v. *United States*, 107 U. S., 437.

I have already referred to the case of *The Cambria Iron Co.* v. *Keynes*, 56 Ohio St., 501. That was a suit upon a guaranty, and it is said in the first clause of the syllabus:

"In construing a contract of guaranty, the object should be to ascertain in the intention of the parties; and as in construing all contracts, the words employed by the parties should be construed in the light afforded by the circumstances surrounding them at the time it was made."

And, in the opinion, at page 513:

"In construing a contract of guaranty, the object should be the same as in construing any other contract: that is, to ascertain the intention of the parties to the instrument, when that intention is ascertained the guarantors are bound by it. While a guarantor may stand upon the strict letter of his contract, his rights extend no further. *To ascertain whether an asserted obligation falls within a contract of guaranty, resort should be had to the situation in which the parties stood and the words they have employed.*"

We had occasion to consider this question and these same authorities somewhat, in the case of *Bank* v. *Garn*, 3 C.C. (N.S.), 428, and it is said in the syllabus in that case:

"A contract of guaranty like any other contract will be given that construction and effect which bests accords with the intention of the parties as manifested by the terms thereof, considered in

connection with the subject-matter to which it relates, *and the circumstances accompanying the transaction.*"

Something is said distinguishing between concomitant circumstances and subsequent circumstances—the use that may be made of each class of circumstances. I read the fourth clause of the syllabus:

"Subsequent transactions not amounting to a modification of the contract, and not part of the concomitant circumstances, can not be considered as a part of the circumstances under consideration in formulating the terms of the contract, and hence can not be looked to for the purpose of ascertaining the sense in which or the intent with which such terms were used; but subsequent transactions under or in pursuance of the contract, or with the contract in view, may be looked to for the purpose of discerning the interpretation the parties have put upon its doubtful provisions."

The matter is discussed at some length and these Ohio authorities are cited and referred to.

We think there is a great deal of sound legal philosophy in the extract quoted by counsel for Newton from Wigmore on Evidence, Section 2407, found at page 3499 of Volume 4 of that work:

"The truth had finally to be recognized that words always need interpretation; that the processes of interpretation inherently and invariably mean the ascertainment of the association between words and extrinsic objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. Words must be translated into things and facts. Instead of the fallacious notion that there should be only interpretation when it is needed, the fact is that there must always be interpretation. * * * Once freed from the primitive formalism which views the document as a self-contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to intrinsic things, and that therefore all the circumstances must be considered which go to make clear the sense of the words * * * that is, their associations with things."

The allegations of the purposes for which the guaranty was given by Mrs. Cole, together with the allegation that "it was not

intended or contemplated, either by said bank or by said Lucy A. Cole, that such guaranty should apply to any loans made by said bank to said F. E. & G. H. Cole, or either of them, other than loans made for and on account of work done under said contracts with the said city of Toledo,'' should not be construed too narrowly. We think that, fairly and reasonably construed, in connection with the other allegations which have been quoted, these allegations amount to saying that the guaranty was not to apply to any other transactions or loans; that it was so understood by the parties; that they contemplated nothing else; that they had nothing else under consideration; that it was not understood or agreed upon between Mrs. Cole and the bank that her guaranty should extend to other transactions, but it was understood and agreed that the guaranty should be limited to the Toledo transactions.

Questions of evidence were argued in the appeal case, where evidence upon that issue was heard under an arrangement that the case should be so tried and a demurrer to this defense in the appeal case should afterward be considered. The questions of evidence debated there, have no bearing upon the questions presented here, upon this record, and we do not mean to intimate any opinion as to the degree of certainty in the evidence that would be required to bring about the result sought by the plaintiff in error. We do not mean to intimate any opinion as to the construction that should be put upon this guaranty, in the light of the allegations, supposing them to be true—I mean the allegations of the circumstances surrounding the transactions—but we think enough is stated to authorize the introduction of evidence of such purpose and intent as is averred, and of such circumstances as are set forth.

We hold that the court erred in striking out these averments and in refusing to allow proof of the circumstances stated in the pleading, and this error was clearly prejudicial, and, on that account, the judgment must be reversed.

In the appeal case this same question is presented by demurrer to the answers of the administrator and heirs of Lucy A. Cole, where these same allegations are set forth as a second defense,

and by demurrer to the amended answer of John T. Newton, where the same matters are set forth; and it follows from what we have said that our holding in that case will be that the demurrer should be overruled; and we now proceed to decide that case as though that defense were in, but we do not find it necessary to consider it, or express an opinion upon the facts adduced in support of that defense; leaving that matter to be tried out in the court of common pleas in the law case.

We come now to consider the case of *Merchant's National Bank* v. *John T. Newton et al,* which is the appeal case, and presents many interesting questions, some of which appear to be rather close, but we are compelled to pass over them rapidly and can not discuss them fully. The action was brought by the bank against John T. Newton, Lucy A. Cole and others, to set aside a conveyance of certain property in the city of Toledo, made by Lucy A. Cole to John T. Newton on the 2d day of September, 1903, and filed for record on the 2d day of February, 1904.

The petition sets forth that Mrs. Lucy A. Cole was indebted to the bank on this guaranty in the sum of $48,000, at the time this conveyance was made, and it charges that the conveyance was made in fraud of the rights of the plaintiff. The petition states:

"Plaintiff is informed and believes and charges the fact to be that at the time of the execution of said deed said Lucy A. Cole was indebted to said John T. Newton for a large sum of money, the exact amount of which is to plaintiff unknown, and that if any consideration passed from the said John T. Newton to Lucy A. Cole for said conveyance, which this plaintiff does not admit but expressly denies, said consideration was the then existing indebtedness of the said Lucy A. Cole to the said John T. Newton, and that said John T. Newton was not a *bona fide* purchaser of said premises for a valuable consideration.

"The value of the premises conveyed by said deed over and above the mortgaged indebtedness thereon was and is largely in excess of the amount then and there owed by said Lucy A. Cole to said John T. Newton."

The indebtedness beside that to Newton was about $23,000, upon a mortgage in favor of the Security Savings Bank & Trust Company. The petition proceeds to allege that the sons of Lucy A. Cole were in failing circumstances and on the verge of bankruptcy at the time this conveyance was made to Newton; that this conveyance carried to Newton all of the real estate of which Mrs. Cole was then the owner and that she had no personal property except her household goods, and then follows this:

"Said deed was executed and delivered by said Lucy A. Cole to said John T. Newton in contemplation of insolvency, and with design to prefer the said John T. Newton to the exclusion of all her other creditors, and was made by her with intent to hinder, delay and defraud her creditors, all of which was well known to said John T. Newton."

After this petition was filed Lucy A. Cole departed this life and Louis M. Cole was appointed her administrator. Louis M. Cole, as administrator, and her four sons, including said Louis M. Cole, being all her heirs at law, join in an answer. John T. Newton also answers. The answers are substantially alike—I don't know but exactly alike. The first part of the answer denies some material allegations of the petition, and then is set forth the second defense, which was considered in the error case, and then a third defense, as follows:

"Further answering, these defendants say, that on the first day of June, 1904, the plaintiff herein, the Merchants National Bank of Toledo, Ohio, filed its petition in the United States District Court for the Northern District of Ohio, Western Division, against the said Lucy A. Cole, and alleging the nature and amount of its claims against her as follows, to-wit:

"Said claim is founded upon contracts of guaranty whereby the said Lucy A. Cole agreed to and did, guaranty the payment of all notes of F. E. and G. H. Cole held by your petitioner, the Merchants National Bank of Toledo, Ohio, also all renewals of the same, and any new loans made to either the said F. E. and G. H. Cole by said bank, and under said contracts of guaranty the said bank holds the notes of said F. E. and G. H. Cole evidencing an indebtedness as of forty-seven thousand nine hundred ($47,900.00) dollars and interest.

"Said petitioner in bankruptcy further alleged that:

"Your petitioner further represents that said Lucy A. Cole is insolvent and that within four months next preceding the date of this petition, the said Lucy A. Cole committed an act of bankruptcy in that she did, heretofore, to-wit, on the second day of September, 1903, convey and transfer all her real estate, with intent to hinder, delay and defraud her creditors. That on said day she transfered, while insolvent, all of her said property to one of her creditors with intent to prefer said creditor over her other creditors; that said transfer and conveyance was made by a warranty deed, which said deed was first filed in the recorder's office in and for said Lucas county, Ohio, on the 2d day of February, 1904.

"The prayer of said petition is to the effect that said Lucy A. Cole may be adjudged by the court to be a bankrupt within the purview of the national bankruptcy law. The said Lucy A. Cole filed an answer to said petition putting in issue the said above-mentioned allegations thereof.

"This defendant further says that the guaranty referred to in said bankruptcy petition, and the deed referred to in said bankruptcy petition, are the same guaranty and deed referred to in the petition herein.

"After the filing of said petition in bankruptcy, and prior to the 22d day of December, 1904, the said Lucy A. Cole died, and on said last mentioned date, by order of the said District Court of the United States for the Northern District of Ohio, Western Division, the action was revived in the name of Louis M. Cole, as administrator of the estate of said Lucy A. Cole, he having been prior to that date duly appointed and qualified as such administrator by the Probate Court of Lucas County, Ohio.

"Afterwards, to-wit, at the December Term of 1905, of the said District Court of the United States, Northern District of Ohio, Western Division, final judgment was entered by said court in said cause, the court finding and adjudging that the facts set forth in said petition in bankruptcy were not proved, and that the said Lucy A. Cole was not a bankrupt, as alleged in said petition, and that said petition was dismissed with costs.

"From said judgment the said petitioning creditor, plaintiff herein, the Merchants National Bank of Toledo, Ohio, appealed to the United States Circuit Court of Appeals for the Sixth Circuit, and on the 8th day of January, 1907, the said United States Circuit Court of Appeals, Sixth Circuit, affirmed said judgment.

"This answering defendant further says that the only issues involved or decided in said bankruptcy cause were:

"First. Was Lucy A. Cole insolvent; that depended entirely on whether she was indebted to said bank by reason of said guaranty, it being admitted that the said F. E. and G. H. Cole were indebted to said bank, and that if said Lucy A. Cole was liable to said bank on said indebtedness by reason of said guaranty, then she was insolvent.

"Second. Did she convey her said real estate to said John T. Newton with intent to hinder, delay and defraud her creditors; or did she while insolvent, transfer her said property to John T. Newton, one of her creditors, with intent to prefer such creditor over her other creditors."

This third defense appears in both answers, and is demurred to. It purports to be a plea of *res judicata*.

We will consider this first with respect to Newton. It is urged on behalf of plaintiff that the matters decided by the district court in the cause referred to in this third defense, can not be taken advantage of by Newton under a plea of *res judicata*, because he was not a party there and was not and could not have been bound by that adjudication, and that being true, under well-known principles applicable to estoppel by judgment, he can not avail himself of the adjudication and contend that others are bound by it as between themselves and himself. The general scope of judgments as estoppels is well and tersely stated in the syllabus in the case of *Mitchell* v. *First National Bank of Chicago*, 180 U. S. Reports, 471:

"Whatever may be the nature of a question presented for judicial determination—whether depending on federal, general or local law—if it be embraced by the issues made, its determination by a court having jurisdiction of the parties, and of the subject-matter, binds the parties and their privies so long as the judgment remains unmodified and unreversed."

John T. Newton was not a party to the record. There are certain forms of proceedings of courts of justice where all the world may be said to be parties to a certain extent, proceedings *in rem* and proceedings like this where the status of a party, whether a bankrupt or not a bankrupt, is determined for certain purposes; and it may be that with respect to the adjudication upon the status of Mrs. Cole it would be fair and would be supported by

authority to say that John T. Newton was bound—was in effect a party—but that would not be going far enough for the purpose designed under this plea of *res judicata*. He was not actually a party and he was not a privy. A privy is one who comes in or acquires his interest subsequently under the action taken, as one who comes in under the judgment.

As set forth in the Duchess of Kingston's case, Vol. 2, Smith's Leading Cases, at page 805:

"Under ordinary circumstances, no one who is not a party to a judgment can be bound as a privy, unless his title originates subsequently to the period at which the judgment was pronounced (*Campbell* v. *Hale*, 16 New York, 575; *Doe* v. *Earl of Derby*, 1 A. & E., 783); and a vendee or assignee will not be estopped by a recovery against the vendor or assignor subsequently to the sale or assignment. And in *Chamberlain* v. *Gaillard*, 26 Alabama, 504, the court held, overruling *Shelton* v. *Barber*, 2 Washington, 82, that an adjudication that a woman is a slave, will not be conclusive on children born before the judgment. This rule meets with an exception in the case of proceedings *in rem* which conclude all the world, and are consequently binding on assignees, without regard to the time of the assignment. *Parker* v. *Danforth*, 16 Mass., 299; *Peck* v. *Barnes*, 24 Vermont, 376."

But the extent to which judgment in bankruptcy cases binds the world, will be shown in certain cases to which I shall refer. That statement must be taken with a qualification or a limitation.

I now refer to the case *In re Henry Ulfelder Clothing Co.*, 98 Fed. Rep., 409. This was a case of involuntary bankruptcy. It was claimed by the petitioner that the bankrupt was indebted to him and also to certain other persons, and the question whether the alleged bankrupt was insolvent and should be adjudged a bankrupt, depended in large measure upon whether he owed these debts. The petitioners, of course, were parties and active in the proceeding. The others who were said by the petitioner to be creditors of the alleged bankrupt were not parties to the record, though the validity and extent of their claims was under consideration. Afterwards, the alleged bankrupt being adjudged a bankrupt, the claims of these other creditors not

parties to the record were presented for allowance, and it was contended on their behalf that the adjudication by the court being based upon their claims and upon the finding that they were valid claims was conclusive. The court held that the judgment was not *res judicata* as to the claims of those who were not parties to the record—those who were not petitioners but whose claims were represented by the petitioners. I read from page 413:

"The claims of Henry Ulfelder and A. Levy were not, in my opinion, conclusively established by the decree against the Henry Ulfelder Clothing Company. It is true, as before stated, that the notes representing these claims were introduced in evidence upon the trial resulting in that decree, and that the general finding of the court that the corporation was insolvent at the time alleged in the petition for involuntary adjudication must necessarily have been based upon an implied finding that such notes were valid obligations of the corporation; but neither Henry Ulfelder nor A. Levy was a direct party to that proceeding, and the validity of their respective claims was not directly in issue therein, but was only brought collaterally in question by others who were parties to that proceeding. If the court, upon the evidence then before it, had found against their validity, and for that reason had adjudged that the corporation was not insolvent, and dismissed the proceeding, such finding and judgment would not have constituted a bar to a subsequent action by Henry Ulfelder and A. Levy against the bankrupt to recover upon the same claims. They would not have been estopped by such a judgment, because, not being parties, the question of the validity of their present claims was not, and could not have been litigated by them, in the involuntary proceeding. In the case of *In re Schick*, 2 Benedict, 5 Fed. Cases, No. 12,445, the defendant was adjudged bankrupt upon the ground that a certain judgment confessed by him in favor of one Cowen was an act of bankruptcy, and in the course of the opinion it was said by Blatchford, J.:

" 'This proceeding, however, is, so far, one merely between the petitioning creditor and the debtor. Cowen, is no party to it, although examined as a witness for the creditor: and in the further progress of the matter, if assignees of the debtor to be appointed should institute proceedings to realize, for the benefit of the debtor's estate in bankruptcy, the property levied on by the sheriff under the execution, Cowen will have a full opportunity to assert his rights, and maintain, if he can, the integrity

of the judgment, and there is nothing in this adjudication to preclude him from so doing.' ''

Cowen, in that case, stood in the same relation to the judgment as does Newton in this case.

And in the case of *In re Drummond*, 1 N. B. R., 231, Fed. Cas. No. 4093, McDonald, J., in adjudging the defendant bankrupt because of his act in preferring certain creditors, said:

"It is proper, also, to say that I give no opinion touching the liability of any of the preferred creditors in case of a suit against them by the assignees in bankruptcy who may be appointed in this case. * * * And, indeed, as the preferred creditors are not parties to this proceeding, it would be unjust that the present decision should in any manner affect their interest, except so far as it fixes the status of Drummond as a bankrupt."

The court cites also the case of *In re Dibbles*, 3 Benedict, 283, Fed. Cas. No. 3844, and the case of *Nelson* v. *Brown*, 144 N. Y., 390 (N. E., 356), in support of the general principle which was applied in this case.

"The record of a judgment, in order to conclude either of the party litigants, must be conclusive upon both. The operation of the rule must be mutual."

In the case of *Densmore* v. *Tomer*, 14 Neb., 392, it is said, in the third clause of the syllabus:

"In the application of the rule of *res adjudicata*, it is essential that its operation be mutual. And a party is not concluded by a judgment in a prior suit, wherein he could not have availed himself of the same means of defense or of redress which are open to him in the second suit."

Citing 1 Greenleaf on Evidence, Section 524. This is an intering case and bears directly upon the case at issue here—the case upon its facts is somewhat like the case we have under consideration. I will read a part of it:

"This matter of the alleged prior adjudication is again pressed upon our attention, with much earnestness. It is true that it was but barely referred to in our former opinion, but the con-

clusion therein reached we still regard as correct. The controversy respecting the property in the United States District Court relied on as bringing the case within the principle of *res adjudicata,* and which seems to have been determined in favor of C. M. Densmore and J. J. Hopper, who constituted the firm of Densmore & Hopper, was between them and certain of their creditors, by whom their discharge as bankrupts was resisted on the alleged ground, among others, that they had wilfully and intentionally concealed 'one certain stock of goods in store in the town of Stanton, and state of Nebraska, consisting of dry-goods, groceries,' etc. The bankrupts, Densmore & Hopper, denied the concealment, alleging that the property in question belonged to Harvey B. Densmore, the plaintiff here. It will be seen, therefore, that the real issue in that controversy, and the only one decided, was simply whether the members of the firm of Densmore & Hopper had wilfully and intentionally concealed their property. And it appears that this issue arose after the assignees had seized and actually disposed of the goods, or at least a part of them, and was responsible to the owner for their value. To this litigation, neither the assignees nor Harvey B. Densmore were parties, and we do not see upon what principle they could be held bound by it. We apprehend that counsel would hardly be willing to concede that, if the decision had been the other way, and the bankrupt's discharge refused on the ground of their concealment of these goods, it would have concluded Harvey B. Densmore upon the question of his right to them. 'It is a general rule that a verdict shall not be used against a man where the opposite verdict would have been evidence for him; in other words, the benefit to be derived from the verdict must be mutual. * * * Where the parties are not the same, one who would not have been prejudiced by the verdict can not afterwards make use of it; for between him and a party to such verdict the matter is *res nova,* although his title turn upon the same point.'

"If instead of granting to the bankrupts a discharge, this judgment had been refused it because of their fraudulent concealment of the goods, it is very clear that Harvey B. Densmore would not have been bound by it. He could, and most likely would have said, with effect, 'I purchased this property before the proceedings in bankruptcy were commenced, and claim to be the owner of it. On the question of the validity of my title, I have not been heard—have not had my day in court. I was not a party to the bankruptcy proceedings, and therefore am not affected by the result.' Such being the attitude of the plaintiff in respect to this judgment, he is clearly within the operation of

the wholesome rule of mutuality above referred to, and therefore
not in a situation to invoke successfully its aid in support of his
title to the goods.   On this point the ruling of the court below
was clearly right.''

These cases, we think, if applied to this case, determine that
Mr. Newton can not avail himself of the plea of *res judicata,* and
the demurrer as to that plea in his answer must be sustained.
It does not follow that that is true as to the same plea in the
answers of the heirs and personal representatives of Lucy A.
Cole.   They are her privies, and they have a right to stand upon
the judgment to the full extent that Lucy A. Cole could have
stood upon it; they stand in her right; they may avail themselves
of the decree defensively or otherwise, to the full extent that she
might have done so.

But, it is said that the demurrer to the plea as to them should
be sustained because it does not appear that the same issues were
involved, and this contention is based chiefly upon the further
claim that different proof was required—that proof of more was
required—to sustain the allegations upon which it sought to have
Lucy A. Cole adjudged a bankrupt, than would be required to
establish in this case that the conveyance as to her was fraudulent
or preferential.   And that brings us to the consideration of the
question:   Would proof sufficient to make a case under the state
law within the language of Section 6343, R. S., make a case under
the Federal law?   It is said by counsel for the plaintiff that
under the Federal law it was necessary to show expressly an
actual intent upon the part of Mrs. Cole to defraud; that nothing
short of active fraud would be sufficient to constitute and make
of such conveyance an act of bankruptcy; whereas, under Section
6343, though there be no active fraud—though there be no actual
fraudulent intent—no deceit, but only constructive fraud, the
conveyance may be set aside.   I think we are all familiar with
the difference between active fraud and constructive fraud, but,
to fix it in our minds clearly for the moment, I will read a para-
graph or two from Words and Phrases Judicially Defined, Vol.
2, 1471:

"'Constructive fraud' is synonymous with 'legal fraud,' and is such as is implied by law from the nature of the transaction itself. The question of the existence or non-existence of an actual purpose to defraud does not enter as an essential factor in determining the question, but the law regards the transaction as fraudulent *per se*.

"Fraud may be actual or constructive. Actual fraud consists in any kind of artifice by which another is deceived; constructive fraud consists in any act of omission or commission, contrary to legal or equitable duty, trust of confidence justly reposed, which is contrary to good conscience and operates to the injury of another. The former implies guilt; the latter may be consistent with innocence."

Now it was alleged in the petition in which it was sought to have Lucy A. Cole adjudged a bankrupt, as follows:

"Your petitioner further represents that said Lucy A. Cole is insolvent and that within four months next preceding the date of this petition, the said Lucy A. Cole committed an act of bankruptcy in that she did heretofore, to-wit, on the 22d day of September, 1903, convey and transfer all her real estate, with intent to hinder, delay and defraud her creditors. That on said day she transferred, while insolvent, all of the said property to one of her creditors; that said transfer and conveyance was made by a warranty deed, which said deed was first filed for record in the recorder's office in and for Lucas county, Ohio, on the 2d day of February, 1904." (It turns out in proof that it was in fact a quit-claim deed in form.)

Section 3 of the bankruptcy law of 1898 sets forth the following as among the grounds of bankruptcy, and these are what are charged and relied upon in the proceedings against Lucy A. Cole:

"Section 3. Acts of bankruptcy by a person shall consist of his having (1) conveyed, transferred, concealed or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay or defraud his creditors, or any of them; or (2) transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors."

It is unquestionably true that under the law as laid down by our Supreme Court in the construction and enforcement of Sec-

tion 6343 and the old Section 6344, which has been incorporated
into 6343, a conveyance may be set aside as fraudulent although
the parties may not have actually intended to defraud.   They
may have conceived and they may have thought that they had a
perfect right in law and morals to make on the one hand and re-
ceive on the other the conveyance, and yet, because of certain
principles of equity which will not permit a failing debtor or an
insolvent debtor to prefer certain of his creditors, the con-
veyance may fail to accomplish its object—it may be held to be
constructively fraudulent.   It is only necessary in certain cases
to show that there was an intent to prefer, not an intent to de-
fraud; an intent to prefer is what vitiates the act in those cases.
We do not find any difference in the federal and state cases on
the subject of inferring an intent from an act; we do not find
any difference on the subject of the rules to be applied in deter-
mining whether the intent to defraud or the intent to prefer
existed.   As we understand it, the rule is uniform, is universal,
under the jurisprudence of England and of this country, that
one may be presumed and is ordinarily to be presumed to intend
the necessary or probable consequences of his acts done with
knowledge of facts and circumstances likely to influence the re-
sults of such act and to bring about such consequences.   And it is
upon the application of that principle that certain conveyances
are set aside as fraudulent—constructively fraudulent—although
there may have been no actual intent to defraud.   We have
failed to find, and we would be very much surprised to find, a
Federal authority based upon a denial or refusal to recognize that
rule, or a Federal authority to the effect that a conveyance or
transfer constructively fraudulent would not amount to an act
of bankruptcy within the purview of Section 3 of the bankruptcy
law.   If a person in fact insolvent, having knowledge of his
insolvency, should undertake to prefer a creditor, which creditor
also knew of such insolvency and intent to prefer, we understand
that a conveyance made under such circumstances and for such
purpose, would not only be invalid at the suit of other creditors,
but would be an act of bankruptcy under Section 3 of the Bank-
rupt act.   But if the grantor had no knowledge of his insolvency

or of facts that would make his ultimate insolvency appear reasonably to be a probable event of the future, we do not understand that his preferential conveyance would be an act of bankruptcy, or would be invalid under Section 6343, R. S.   Neither do we understand that a presumption of an intent to prefer may be based upon a mere presumption that the grantor knew of the extent of his contingent obligations as guarantor when he has no actual knowledge of the default of his principal.

The Federal court found that Lucy A. Cole was not a bankrupt, and dismissed the petition; and this finding was made notwithstanding the further finding, made or assumed, that she was in fact insolvent at the time she made this conveyance to Mr. Newton.   But it could not be found, from the circumstances or otherwise, that at the time she made the conveyance, she was aware of her insolvency, and therefore it could not be found that she had the intent to prefer Mr. Newton as a creditor over other creditors.   The Federal court further found that she had no intent to hinder, delay or defraud her creditors.   These findings are so broad as to include and determine any controversy as to whether she at the time contemplated insolvency within the meaning of Section 6343, R. S.,   The finding is, that if she was insolvent, she did not know it; that she did not know of the debts or obligations that may have existed to make her in fact insolvent.   So, manifestly, the finding covered the question whether she contemplated insolvency.   If she had no knowledge of these conditions—and that was one of the issues made (as the proof showed here) in the Federal case that was tried out and decided—she could not, within the meaning of Section 6343, R. S., have contemplated insolvency; for, as we understand the meaning of that term, as used in our statutes, it is this—one must be aware of his insolvency or aware of the imminency of his insolvency; he must have knowledge of such facts and circumstances, at least, as would convey to the mind of a prudent person that in all probability, or within reasonable probability, he must become insolvent.   He must look forward to and contemplate his insolvency as a matter at least likely to occur.   But if he has no knowledge of any obligations or debts which are likely to press

upon him to make him insolvent, or to amount to enough to prob-
ably make it impossible for him to meet all his obligations as they
mature, he could not contemplate insolvency; and it seems to us
that under the issues as made in the Federal court, considering
the evidence submitted upon the issues, and the view taken of the
issues by that court and the conclusions reached upon the facts, it
must be said that that decision determines that Mrs. Cole was
not then insolvent and that she could not have then contemplated
insolvency.

We understand that that determination, as between the parties
and their privies, is conclusive, and can not be questioned as long
as it stands, either in that court or in any other court, and that
this result is not affected by the fact that the object of that suit
was not to set aside the conveyance to Mr. Newton, and that the
judgment in the case could not have the effect of setting aside
that conveyance; it is conclusive between the parties in any case
where it would be influential in determining the rights of the
parties, and where the parties might thereafter desire to inter-
pose it to prevent action contrary to or affecting the results of
such judgment.

We conclude that the demurrer to this third defense in the
answer of the heirs of Mrs. Cole should be overruled.

It is not clear to us that this ruling necessarily determines the
controversy as between Newton and the bank.    It is evident that
no decree can be entered—no action taken—that would in any
way affect to their prejudice the rights of these heirs and this
personal representative arising under that judgment of the Fed-
eral court.    Whether, notwithstanding that, the suit could go
forward in any form so as to work out the rights the bank might
have against Newton, we are not prepared to say.    It might be
possible.    Assuming that it would be possible, we proceed to a
determination of the case upon the merits.

As to the merits, the conclusion of Judge Tayler of the United
States Court as set forth in the record presented to us in evidence,
and the conclusions of the Circuit Court of Appeals, should
naturally and properly have a strong and persuasive influence
upon our minds, as the case presented there and the case pre-

sented here are substantially the same. Of course we have here the further question as to the attitude and knowledge of Newton, but if the attitude, knowledge and action of Mrs. Cole in the premises was invulnerable—I mean to say that if her position as .grantor, and that of her privies, was and is invulnerable—it is not clear that it would be worth while to consider what knowledge or intent Newton may have had; but, after full consideration of all the facts, and including the facts which are presented to us as indicia or badges of fraud, we have concluded that there is not enough in the evidence to show that Newton had such knowledge of the financial condition and affairs of Mrs. Cole as would make the conveyance invalid because of such knowledge.

A question of evidence is presented which must be solved, and which, it is said, was not presented in the Federal court, and that is as to whether the deed upon its face amounts to a declaration that it is a voluntary conveyance, and if so, whether this declaration is open to explanation or contradiction. The deed sets forth that it is made in consideration of "one dollar," and it is said that this consideration may not be disputed; that this consideration is nominal, that it amounts to a voluntary conveyance, and that if a voluntary conveyance—in other words, a conveyance not supported by an adequate and valuable consideration—of course it must be set aside.

Authorities are presented on behalf of the plaintiff that go to the full extent of sustaining this position. But authorities on this question are not uniform, are not an unbroken line, and we think that the authorities which are opposed to this position are weightier and are supported by better reasoning. One of the cases cited in support of the contention that the consideration may be inquired into, notwithstanding a nominal consideration is mentioned, is *Steele* v. *Worthington,* 2 Ohio Rep., 182, which seems to fully sustain that point; and on this point, though they do not all bear directly upon it, are cited *Conklin* v. *Hancock,* 67 O. S., 455; *Groves* v. *Groves,* 65 O. S., 442; *Vail* v. *McMillan,* 17 O. S., 617; *Harvey* v. *Alexander,* 10 Am. Dec., 521 (Randolph, [Va.], 219); *Jones on Real Property,* 298, 301, 302; *Waite on Fraudulent Conveyances,* Sections 220, 221; *Hetrick* v. *Gregg,*

8 N. P., 24, 26; *Campbell* v. *Bellman Bros.,* 11 Circuit Court, 360; *Paulding* v. *Chrome Steel Co.,* 94 N. Y., 334; *Burdick* v. *Johnson,* 7 Hun., 488; *Sawyer* v. *Turpin,* 91 N. S., 114.   But we think the law is correctly laid down in the 2d Ohio before referred to, and in the case of *Harvey* v. *Alexander, supra.*   I read from the syllabus:

"Where the consideration expressed in a deed is 'love and affection,' and 'one dollar,' parol proof of other valuable consideration, is admissible."

It was said by the court in delivering the opinion:

"The counsel for the appellant, considering this deed as voluntary on the face of it, contended that proof of valuable consideration was inadmissible, as being inconsistent with the deed.   But the court is of the opinion that the question whether evidence inconsistent with the deed can be admitted does not arise in this cause.   This is not the case of a deed purporting to be for good consideration only.   It is in express terms, for valuable as well as for good consideration.   It is true that the valuable consideration expressed is only one dollar.   But one dollar, viewed as a consideration, is as much a valuable consideration as a million of dollars.   The real question is whether a deed purporting to be for 'love and affection,' and for 'one dollar,' and assailed as being fraudulent as to creditors, can be supported by evidence showing that in addition to the one dollar expressed, full value was received by the grantor.   This question may be simplified by supposing the deed to have been between the same parties, and for the same purposes, and that the only consideration expressed in the deed was the sum of one dollar, paid by the grantee.   It could hardly be doubted that the evidence would be admissible in that case.   Indeed, the principle of the objection made by counsel for the appellant, that the evidence would be inconsistent with the deed, does not apply to such a case.   It is believed to have been the practice at an earlier period, both in England and in this country, for deeds not to express the actual sum, but a nominal one only, and yet the court has not seen a single case in which it has been held incompetent for the party claiming under the deed to aver and prove the sum really given."

I think counsel for plaintiff did cite one common pleas decision in this state where that very thing was held.   Now it does not seem to us to be reasonable that parties dealing in good faith and

innocently with respect to property, and feeling that nobody else in the world is interested in the transaction but themselves, and that therefore they may if they please name any consideration, and that it will not concern or affect anybody else if it afterwards develops that the grantor has creditors, those creditors, without regard to the good faith of the transaction, and what the consideration actually was, may successfully insist upon the nominal consideration of one dollar being regarded conclusively as the *only* consideration upon which the conveyance was made. These technical rules and presumptions must be founded upon reason, upon what is supposed to be the general and uniform, or nearly uniform, practices of men. In certain of the cases cited, where the character of the estate is fixed by the character of the consideration named, so as to fix the direction of the descent, so as to determine upon whom the property shall devolve in the event of the death of the grantee, intestate, it is perfectly reasonable to hold that the consideration named in the deed, whether a valuable or a good consideration, shall not be open to contradiction upon the part of mere volunteers; that is to say those upon whom the estate is cast, or upon whom it might have been cast had a different consideration been named. It is reasonable to hold that the grantee and grantor intended to determine the course of descent, whether it should be regarded as ancestral or non-ancestral property, and they had a right to determine this, and those taking under the deed as mere volunteers might be with justice conclusively estopped from inquiring into the real consideration. That seems to be the ground of this rule. But in case of a deed charged to be fraudulent because voluntary, and where it is urged that the character of the deed as between the parties thereto is irrevocably fixed by the recital of a nominal consideration, and where an attempt is made to show that the deed was not in fact voluntarly, but was supported by a substantial, valuable consideration, and further, that the grantor had no knowledge of other creditors, should it be said that a conclusive presumption arises, that the parties intended that this deed should be fixed in its character as a voluntary conveyance, even though not in fact voluntary, thereby permitting other creditors to seize the property?

The rule in the case first given is based upon the supposed intention of the parties to the deed—I mean a case where the character of the estate is fixed by the deed for the purpose of devolution. Could it be fairly said that such intention to defeat the very purpose of the deed in cases like that at bar is so general and uniform that a conclusive legal presumption to that effect, to be enforced in all cases, should arise thereon? We think not. So that, with this question out of the way, the case stands substantially as it stood in the Federal court—on the evidence.

The evidence discloses that this deed was at the time it was made, as between the parties, in effect a mortgage. It was not recorded as a mortgage. It is contended that, it being in effect a mortgage, and not recorded as such within three days, as required by the statute, the preference sought to be given must be disregarded or set aside. But it was, in form, a deed, and took effect as a deed, and therefore we think it was proper, so far as the record of the paper was concerned, either under the recording acts or under Section 6343, to file it and have it recorded as a deed, and that this is so without respect to the question of its effect because of other agreements, *aliunde* the deed, making it a mortgage. We think this view is sustained by the case of *Kemper* v. *Campbell,* 44 O. S., 210. There has been no change in the statutes since this decision which would change that result.

It is also urged that this conveyance is to be treated as preferential within the meaning of the statute to the extent of the old debt owing by Mrs. Cole to Mr. Newton at the time this conveyance was made. It appears that there was then a mortgage resting upon the property in favor the bank for $23,000; that she was indebted to Mr. Newton in the sum of $30,000 (there is some little question about the amount that she was in fact indebted to him at that time, but we will assume that it was $30,000 and that the new loan was $25,000); that if this transaction may be supported as a new loan it may not be supported as to the old indebtedness of $30,000. Counsel for plaintiff, in his brief makes a very ingenious analysis of this statute, as it now stands— Section 6343—and undertakes to show that, if correctly construed, there can be no such thing as a valid preferential mort-

gage, *i. e:,* based on a past consideration. But we think that he is wrong in his reasoning, and that he is led into error by giving too much weight and consideration to the proviso respecting mortgages and too little to the provision with respect to what shall render a conveyance invalid. We understand that the law is now, what it has been for a long time, in Ohio, that a valid preferential mortgage or deed may be made by an insolvent, provided he does not make the grantee or mortgagee a trustee for other creditors, and provided the grantee is in ignorance of the insolvency and purpose to prefer, or provided the consideration is not so grossly inadequate in case of a deed as to justify a court of equity in regarding the conveyance as in a measure voluntary. All such conveyances and mortgages are valid. Also we believe that even with knowledge of the insolvency of the mortgagor, the mortgagee may take a mortgage to secure loans made on the faith of the promise of such mortgagor given when the debtor was not insolvent, thus to secure the debt. And that principle applies to the situation of Mr. Newton with respect to the $30,000.

This credit seems to have been given with the understanding that he should have this conveyance whenever he deemed it necessary for his security. This principle is recognized by this court in the case of *Campbell* v. *Bellman,* 11 C. C., 360, which we regard as still applicable to cases of like character arising under the present statute—that is to say, there has been no change in the statute that would make this authority inapplicable or obsolete.

It is our judgment that this conveyvance should stand; that it is not vulnerable to the attack that has been made upon it. Whether it should stand as a deed or as a mortgage, whether the other creditors may have any right in any other action to insist upon its being regarded as a mortgage, rather than a deed, whether anything can be worked out for them upon that theory, or proceeding in that way, is a question not before us for consideration, and upon that we express no opinion. The petition will be dismissed at the costs of the plaintiff.